WOODS, Housing Expediter, v. GATES et ux.

Civ. A. No. 2469.

United States District Court
W. D. Louisiana, Monroe Division.

Feb. 15, 1950.

H. C. Happ, Lowell D. Gibson, Ted P. MacMaster, Dallas, Tex., for plaintiff.

Robert M. McGehee, Downsville, La., for defendant.

DAWKINS, Chief Judge.

This suit, filed on August 27, 1948, seeks an injunction against the collection of rents alleged to be in excess of those fixed by the Rent Control Office under the Housing Act of 1947, as amended, Public Law 464

—80th Congress, 2d Session, 50 U.S.C.A. Appendix, §§ 1881–1902, upon certain apartments in a single building in the village of Mer Rouge, Louisiana, and prays that the defendants be required to "restore to the tenants" named the amounts and for the periods stated in "Schedule A," annexed to the complaint.

Defendants contend that the property in question is a commercial hotel, released from control by the said Housing Act of 1947, supra, and second, that the base period rates were in excess of those set out in the purported orders of the Rent Control Office; and finally, that they have been denied the right of review by the Regional Office at Dallas, Texas, including the question of their right to increase rents because of the expenditure of several hundreds of dollars for improvements and repairs.

The record reflects and the court finds the facts and circumstances in the following sequence: The real property involved is a two-story building, containing between twenty-five and thirty rentable rooms, formerly operated by Mr. and Mrs. G. M. Sims for some twenty years as the Mer Rouge Hotel prior to its sale to the present defendants on January 1, 1948. In "the horse and buggy days" when salesmen or drummers, as well as other transients, were caught at Mer Rouge overnight, they were registered, given accommodations and furnished services, including linens, maid service, butler service, etc., the same as in any other small community. However, with the building of good roads, increase of automobiles, etc., trade of this sort practically disappeared, because the travellers could usually make it into the larger towns and cities with their bright lights and other attractions. Human nature being what it is, such hotels followed the stagecoach into limbo, except that the buildings remained for other types of occupants.

The evidence shows that by or before 1940, about a year before we got into the second World War, and some two years before rental control (which then included even hotels) became necessary, the former owners had begun converting the rooms into two-, three- and four-room suites or apartments and renting them on a weekly or monthly basis, both furnished and unfurnished. While there were baths, connecting or otherwise, toilets, hot and cold running water, etc., there was no maid service or bell hops, and in many instances the tenant paid the utility bills. It was not made clear in the evidence as to just how many single rooms remained, the extent of their renting rates, etc.

The former owners, Mr. and Mrs. G. M. Sims, never registered the property for rent control at any time before their sale to the defendants on January 1, 1948, although prior to the amendment of the Rent Control Act in 1947, it was clearly subject to control, even as a hotel. Having thus escaped, the majesty of the law descended upon their vendees here, the authorities having been made aware of the existence of the Mer Rouge or Sims Hotel by the usual sources, to wit, the complaints of tenants that their rents had been doubled by the new owners. Thus becoming conscious of the situation at Mer Rouge, on January 28, 1948, following the purchase on the first of that month by defendants, the Monroe-Bastrop Rent Office called the attention of one of the defendants, Mrs. Hazel Gates (at other times referred to as Mrs. Tom Gates), to the fact that the property had not been registered for rental purposes and requested that she appear at said office within five days "for a conference on this matter," and that she bring receipts, account books, correspondence, etc., "so that you can sustain any statements that you make." Thereafter, the lady appeared, and on February 25, 1948, signing as "Mrs. Tom Gates," executed five registration forms covering accommodations involved here, under circumstances which she charges induced her to do so against her wishes, to wit, the statement by the agent in charge that it would enable her to require an increase in rents from her tenants. This, of course, is disputed, and is of little importance anyway, if under the facts the property is subject to registration.

On July 28, 1948, the Acting Director of the "Rent Division, Monroe-Bastrop Defense Rental Area," issued its orders (we

have been able to find only five registrations, although there appear to be six orders fixing the maximum rent on the premises or apartments described and stated in "Schedule A," attached to the complaint). Shortly thereafter, desiring a review of this ruling, Mr. and Mrs. Gates obtained and filled out blanks for that purpose and submitted their Application for Review to the Regional Office at Dallas, Texas. In a "memorandum" dated November 9, 1948, addressed to the Monroe Rent Office, "from H. C. Happ, Regional Attorney," it was stated that there were being returned "three copies of the above described Application for Review Mer Rouge Hotel * * * Mrs. Hazel Gates, landlord * * * forwarded to this office. Since all three copies were sent to us and since no docket number is found on the face of the D–9, it appears that the case has not been docketed by your office."

"The D–9 does not properly identify the units concerned and does not identify orders to be reviewed. We believe you should request the landlord to file a new Application for Review, giving that identification. *If the landlord refuses, however, to file a new Application for Review, we believe that this one may be docketed and processed in the usual manner, as an appeal from all orders concerning the Mer Rouge Hotel.*" (Emphasis by the writer.)·

In the upper right-hand corner of this document is a notation in pencil reading: "Send Mrs. Gates more D–9's, quote second paragraph."

Thereafter, the date not being typed as was the body of the carbon copy offered in evidence, but written with pen as "11–16–48," there was addressed to "Mrs. Hazel Gates" at Mer Rouge a letter signed by "W. E. Graham, Rent Examiner," advising that her Application for Review had been returned as "rejected" by the Dallas Office, and quoting the second paragraph of Happ's memorandum above, as had been suggested in the Monroe office, apparently. This communication concluded: "The above is quoted from the letter received from Dallas, as we are herewith enclosing new forms for your convenience."

In the meantime this suit had been filed on August 27, 1948, about a month after the issuance of the several orders fixing the rent ceilings on the apartments on July 28. Defendants had answered on September 27 of the same year, and on the following day complainant filed "request for admissions of fact and genuineness of documents," items 1 to 5, inclusive, being as to the genuineness of registration statements as to two apartments and three copies of the five orders fixing rents for the apartments. The application then requested defendants to admit as true statements recited in items numbered 6 to 52.

Without finding it necessary to state or quote from the documents at length, it is sufficient to say that the answers, together with the stipulations at the beginning of the trial, conceded that defendants had signed all but one of the registration statements, that the orders fixing rent ceilings had been received, and that the persons to whom rented, descriptions of apartments, with one exception, shown in "Schedule A" were correct.

It thus appears that due to the inertia of either the counsel for defendants or the Monroe Rent Office, and perhaps both, the rulings of the Acting Director at Monroe have not been reviewed by the director of the Regional Office at Dallas, Texas. The Acting Director at Monroe was instructed that, if the defendants declined to fill out new Applications for Review, the ones first sent "be docketed and processed" by the local office and then returned for review. This was never done.

As to whether this review will produce any different results, we of course do not know. It is not the business of the court, nor does it have power, to fix rental ceilings. The first question is as to whether the property was operated as a hotel during the period in question within the meaning of the law as amended by the Act of 1947; and if not, the next and more important matter is as to what were the rates received for these apartments at the base period in March, 1942, when rent control went into effect. It is true that an investigator for the Rent Control Agency made a report, not under oath, that the facts as

to these matters had been investigated with respect to all units, and there are affidavits by the former owners, etc., not appearing to be conclusive, and no mention or consideration appears to have been given to the alleged expenditures for repairs and improvements which defendants claim amounted to several hundreds of dollars. It is believed that all of these matters should be carefully investigated and considered by the proper agency, so as to determine fairly the rights of these defendants, especially in view of the contention which they make that the rates ordered by the Monroe Office would be confiscatory.

■ This case will be stayed in order to permit a compliance with the request of the Regional Office that the applications be docketed, processed by the local agency, and passed on for review.